STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

SAILAJA M. PAIDIPATY (NYBN 5160007)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    sailaja.paidipaty@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>ADONIS TORRES,<br><br>    Defendant. | CASE NO. 20-480-06 WHA<br><br>**UNITED STATES SENTENCING MEMORANDUM**<br><br>Judge: Hon. William Alsup<br>Sentencing Date: March 1, 2022<br>Time: 2:00 p.m. |

## I. INTRODUCTION

For years, Adonis Torres sold drugs on the streets of the Tenderloin. From 2006 to 2020, he was stopped by the police on eight occasions relating to drug dealing. Within that period, he was deported four times, each time coming back to the Bay Area where he engaged in further narcotics sales. Prior to his arrest in this case, he worked as a street-level dealer for the drug trafficking organization (DTO) run by Leydis Yaneth Cruz and Emilson Cruz Mayorquin. On a near daily basis, he, along with another co-conspirator Pamela Carrero, traveled from the East Bay to the streets of the Tenderloin where they sold drugs, including fentanyl. At the time of his arrest in this case, just a few blocks from the federal courthouse, Torres possessed 82 grams of suspected fentanyl, 31.7 grams of suspected heroin, and 4.7 grams of suspected methamphetamine.

Torres's role in the conspiracy did not rise to the level of a leader/manager, such as Emilson,[1] who the Court sentenced in December, or Leydis whose sentencing hearing is upcoming. Unlike those defendants, Torres did not have connections to drug suppliers, but rather received his drug supply through other members of the Cruz DTO. Instead, Torres was one of the many street-level dealers working for the DTO along with, Carrero, Ivan Mauro Cruz Mayorquin, Mayer Benegas-Medina, and Ana Maldonado. As detailed below, of these street-level co-defendants, Carrero was the most culpable based on the volume of her drug sales and access to suppliers, and Maldonado was the least culpable based on her more infrequent narcotics sales. Intercepted calls coupled with surveillance indicate that Torres, Ivan, and Benegas-Medina fell squarely in the middle of this set co-defendants; they all were daily street-level dealers who sold similar amounts of drugs. For those reasons, Torres is not *substantially less culpable* than the average participant, which is required for the application of a two-level reduction for playing a minor role under the U.S. Sentencing Guidelines.

Though the minor role adjustment does not apply based on the requirements of the Guidelines, a variance is warranted based on Torres's relatively lower role in the conspiracy and to avoid unwarranted sentencing disparities. The government therefore recommends that this Court impose a 36-month term of imprisonment (a five-month variance from the low-end of the advisory Guidelines range), followed by three years of supervised release, a $100 mandatory special assessment, and forfeiture.

## II.    PROCEDURAL POSTURE

On December 8, 2020, the Honorable Laurel Beeler, U.S. Magistrate Judge, issued a criminal Complaint charging Torres and five co-defendants with conspiring to traffic fentanyl in the Bay Area. Dkt. 1. In conjunction with the Complaint, the Court issued warrants authorizing the arrest of Carrero and her co-defendants. *Id.* Two days later on, December 10, 2020, federal agents arrested Torres and six other individuals (the five co-defendants charged in the Complaint as well as one other individual, Mayer Benegas Medina who was charged the same day in a separate Complaint, *see* 20-mj-71816-MAG). The following week, a federal grand jury returned an Indictment charging Torres and the six individuals arrested on the day of the takedown. Dkt. 23. Torres was charged with one count of

---

[1] Because many of the defendants in this case have the same or similar last names, the government will refer to some co-defendants by their first names to avoid confusion.

participating in a conspiracy to traffic fentanyl. *Id.*

On September 7, 2021, Torres entered a guilty plea to Count One of the Indictment (the sole count he faces) pursuant to a written agreement with the government. *See* Dkts. 97-98.

### III. SENTENCING GUIDELINES CALCULATION

The parties agree that at minimum, the U.S. Sentencing Guidelines calculation is as follows:

a. Base Offense Level (U.S.S.G. §§ 2D1.1(a)(5), (c)(8)):     24
   (At least 40 grams but less than 160 grams of fentanyl)
b. Acceptance of Responsibility (U.S.S.G. § 3E1.1(a):     - 3
c. Final Offense Level     21

The plea agreement left open defendant's ability to argue in favor of a two-level role reduction for being a minor participant in the offense pursuant to U.S.S.G. § 3B1.2(b). The government agrees with the determination of the U.S. Probation Office ("Probation") that the role reduction is unwarranted. *See* Presentence Report (PSR) ¶ 3, 20.

As a threshold matter, a "defendant bears the burden of proving that he is entitled to a downward adjustment based on his role in the offense." *United States v. Rodriguez-Castro*, 641 F.3d 1189, 1193 (9th Cir. 2011) (internal citations omitted). Application Note 3(A) to U.S.S.G. § 3B1.2 indicates that a mitigating role reduction applies to a defendant "who plays a part in committing the offense that makes him *substantially less culpable* than the average participant in the criminal activity." U.S.S.G. § 3B1.2, Application Note 3(A) (emphasis added). With respect to a drug trafficking organization, the Application Note goes on to provide the example of an individual whose participation in the offense was limited to transporting or storing the drugs as a defendant who is potentially eligible for the reduction. U.S.S.G. § 3B1.2(b), Application Note 3(A). The Notes further explain that the court must make a fact-based determination and consider several non-exhaustive factors including: (i) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised or influenced the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the crime; and (v) the degree to which the defendant stood to benefit from the crime. U.S.S.G. § 3B1.2, Application Note 3(C).

There is no question that Torres did not participate in higher-level planning or organizing of the overall conspiracy, and he did not exercise decision-making authority over others. However, that is where the factors stop being in his favor. Torres knew the general scope and structure of the organization including that Leydis was one of the main drug sources. During intercepted phone calls, Torres asked Leydis whether she had received a supply of "glass" – a common code word for methamphetamine. PSR ¶ 12. During the same call, he asked if Carrero had any "blue" fentanyl for sale. *Id.* Carrero indicated that they did not have any at the time, but that the source of supply would arrive later that day. *Id.* These calls illustrate that Torres knew which members in the DTO had connections to drug suppliers and he also knew that the organization sold many different types of drugs. Further he bought several types of drugs from the organization that he went on to resell. During intercepted calls, Torres placed orders for multiple types of drugs, and at the time of his arrest in the Tenderloin, federal agents seized the defendant's backpack, which contained distribution quantities of fentanyl, methamphetamine, and heroin seized from his backpack at the time of his arrest on the streets of the Tenderloin.

Next, while Torres did not receive a proprietary cut of the overall organization's business, he had some influence over his own sales and profit; he bought drugs from the leaders of the organization and when he resold them could set his own price. His profit was determined by the amount of drugs he could source and sell, rather than being a salaried employee who received the same payment daily from the organization regardless of the volume of his drugs sales.

Finally, and as stressed by the Application Note to the Guidelines, the Court must assess Torres's culpability relative to his co-defendants. Over the course of the investigation, law enforcement identified Carrero, Torres, Ivan, Benegas-Medina, and Maldonado as individuals whose primary work for the organization consisted of street-level drug sales. Of these individuals, Carrero is the most culpable as she had more direct connections through her mother and brother to the individuals supplying the DTO with drugs and through those connections managed to procure significant quantities of fentanyl and counterfeit pharmaceutical pills containing fentanyl that she sold to an undercover agent. Ana Maldonado falls on the opposite end of the spectrum as the least culpable because unlike the other street-level dealers, Maldonado did not sell drugs on a daily basis. Her sales were more sporadic, and

her role consisted otherwise of behind-the-scenes assistance to her boyfriend, Emilson. Torres, Ivan, and Benegas-Medina all fall squarely in the middle of this set. Intercepted calls and surveillance indicate that they dealt drugs in the Tenderloin nearly daily. They sold multiple types of drugs, but their primary "product" was fentanyl. In being similarly situated to these other defendants, Torres is not "substantially less culpable" than the other participants, as he must show for the Guidelines reduction to apply. Indeed, the evidence shows that he *was* the average participant in these types of conspiracies – he was a foot soldier who was well aware of what he was doing. He was not an unwitting courier or a more passive individual who merely stored drugs rather than selling them. Considering these factors together, Torres cannot show that the Guidelines reduction applies.

Without the reduction, Torres's final offense level is 21. Probation calculates Torres's Criminal History Category as CHC II, resulting in an advisory Guidelines range of 41-51 months. As noted above, the government seeks the imposition of a 36-month sentence, which constitutes a 5-month or 12.5% downward variance from the Guidelines range.

**IV.    GOVERNMENT'S SENTENCING RECOMMENDATION**

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin by calculating the correct sentencing range under the Sentencing Guidelines. Id. The Guidelines are "the 'starting point and the initial benchmark,'" *United States v. Ellis*, 641 F.3d 411, 415 (9th Cir. 2011) (quoting *United States v. Kimbrough*, 552 U.S. 85, 108 (2007)), and the Court should "remain cognizant of them throughout the sentencing process." *United States v. Gall*, 552 U.S. 38, 50 n.6 (2007). After determining the appropriate Guidelines calculations, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93. Here, the most important considerations are the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to afford adequate deterrence. 18 U.S.C. § 3553(a)(1), (a)(2)(B).

**A.    Torres sold fentanyl in the Tenderloin despite prior arrests for drug trafficking, convictions for illegal entry, and four deportations.**

Torres is no stranger to being on the wrong side of the law with respect to selling drugs. Though

he only has two state criminal conviction relating to narcotics trafficking, he has been stopped by police on at least eight occasions in relation to drug sales *prior* to his arrest on the federal charges. *See* PSR ¶¶ 38-39, 43-45, 49-51. These law enforcement contacts began when he was 18 years old, resulting in his first conviction, and continued until his arrest here at which point, he was 33. *Id.* at Page 3; *see also id.* ¶ 38. Though most of these encounters did not result in prosecution, Torres, particularly following his convictions in 2007, was on notice that his conduct was illegal. *See* PSR ¶¶ 43-46; 49-51. The minimal term of imprisonment that he received for those convictions, 42 days jail followed by probation, failed to deter further criminal conduct. *See id.* ¶¶ 38-39.

Following his 2007 convictions, Torres was deported to Honduras. Instead of remaining there, he twice illegally re-entered the country resulting in two felony convictions for illegal entry. PSR ¶¶ 40-41. As a result, he was sentenced to an increasing number of days in custody, 90 days for the first offense, and 180 days for the second. *Id.* Despite these sentences, Torres remained undeterred. Following his third deportation, Torres once more attempted to enter the United States in 2014. This time, it appears that instead of facing additional criminal charges, he was quickly deported once more. *See* PSR ¶ 48. Yet again, despite four prior deports, Torres returned to the United States where between 2016 and 2019, he was arrested or stopped by officers of the San Francisco Police Department on six occasions. *Id.* ¶¶ 43-45; 49-51.

Even as he returned to the Bay Area and returned to drug dealing, Torres was continually offered opportunities to turn a corner. In 2017, following an arrest for hand-to-hand drug sales near the corner of Market and 8th Streets, Torres participated in a diversion program offered by the Superior Court, San Francisco County. *See id.* ¶ 44. According to the PSR, Torres completed the program on May 17, 2018, at which point his state criminal case was dismissed. *Id.* Just 12 days later, officers of the San Francisco Police Department arrested Torres who at the time possessed bindles of suspected heroin and suspected cocaine. *Id.* ¶ 45. It is unclear why state authorities did not pursue a criminal charge following this incident, but against the backdrop of Torres's other prior arrests and grants of leniency, this appeared to be one of several instances where Torres learned that no consequences or few consequences would result from his unabated drug dealing.

As part of his work for the Cruz DTO, Torres sold not only "traditional" drugs that he had been

arrested with previously, but also sold fentanyl.  At the time of his federal arrest, he possessed over 80 grams of fentanyl.  PSR ¶ 16.  With a two-milligram dose being potentially lethal,[2] this quantity on one day alone constituted 40,000 potential deadly doses.  The introduction of fentanyl to the drug trade means that even a "mere" street-level dealer can sell and be responsible for a significant and impactful quantity of drugs.

> **B.  Comparing Torres's role in the offense, age, and criminal history with that of his co-defendants, a 36-month custodial sentence is a proportionate sentence and avoids unwarranted sentencing disparities.**

Given the nature and scope of the conspiracy, determining an appropriate sentence for Torres requires assessing his culpability relative to his co-conspirators in order to avoid unwarranted sentencing disparities.  *See* 18 U.S.C. § 3553(a).  While as described above, Torres does not meet the requirements under the Sentencing Guidelines for a minor role reduction, in practice, he occupied a lower position in the organization than others this Court has sentenced.  For that reason, the government recommends a five-month downward variance from the low-end of the Guidelines and seeks the imposition of a 36-month sentence.  In arriving at its recommendation, the government considered Torres's culpability compared to previously sentenced co-defendants, Emilson and Carrero, and Torres's history and characteristics, particularly his age and criminal history, in comparison to those same defendants.

First, the parties and Probation all agree that Torres played a lesser role in the organization than Emilson, one of the leaders of the DTO, who was sentenced to 51 months in custody.  That sentence incorpoated a one-level variance for reasons addressed during that hearing.  Emilson sourced drugs for the organization, sold a greater quantity than Torres, and based on the government's understanding of Emilson's profits, made more money than Torres.  The sentences of these two men should reflect these notable differences in the degree of the criminal conduct committed.  However, that reduction can only go so far.  While Emilson undoubtedly was one of the heads of the organization, he also is a young man with a minimal criminal history.  At the time of Emilson's sentencing, his counsel noted, and the Court accepted, that his youth and lack of maturity contributed to his conduct.  In contrast, Torres will be 34

---

[2] Drug Enforcement Administration.  Facts about Fentanyl.  Available at: https://www.dea.gov/resources/facts-about-fentanyl#:~:text=Two%20milligrams%20of%20fentanyl%20can,dose)%20of%20fentanyl%20per%20tablet (last accessed Feb. 22, 2022).

USA SENT. MEM.                              7
20-480-06 WHA

years old at the time of his sentencing, having been around the drug trade since the age of 18. He has amassed more arrests, deportations, and illegal re-entries than Emilson. His conduct is far past a "youthful indiscretion," but rather reflects the intentional choice to continue engaging in drug sales.

      Second, the government agrees that Torres is less culpable in the overall conspiracy than Carrero. While Carrero primarily worked as a street-level dealer with Torres, her drug connections through Emilson and Leydis allowed her to source and sell fentanyl and counterfeit pills containing fentanyl to an undercover agent on numerous occasions. PSR ¶ 15. Based on this alone, it would follow logically that Torres should receive a sentence lower than the 19 months imposed on Carrero (the government recommended a 27-month sentence with respect to Carrero). However, as the Court well knows from a series of extended hearings, Carrero's case raised unique mitigating factors. Her past sexual and physical trauma, her young age (21 at the time of sentencing), and her lack of prior convictions set Carrero apart. Indeed, during the sentencing hearing on February 22, 2022, the Court noted that had Carrero been even ten years older, the Court's view would have been difference. Here, Torres is 13 years older than Carrero and has prior drug trafficking and immigration-related convictions. And Carrero faces the prospect of permanently losing custody of her child, a collateral consequence that the Court found to be a considerable punishment. The combination of those mitigating factors and collateral consequences, none of which apply to Torres, merited the sentence imposed by the Court. While Torres did not sell drugs to an undercover agent and did not have direct connections to drug suppliers, his age, criminal history, and lack of other mitigation factors both indicate that higher sentence in comparison to Carrero is warranted. For those reasons, the government recommends the imposition of a 36-month sentence, which constitutes a five-month variance from the low-end of the advisory Guidelines range.

//
//
//
//
//

## V. CONCLUSION

The United States respectfully requests that this Court impose a sentence of 36 months' imprisonment, followed by three years of supervised release, a mandatory $100 special assessment, and forfeiture of the electronic device identified in the plea agreement.

DATED:                                   Respectfully submitted,

                                         STEPHANIE M. HINDS
                                         United States Attorney

                                         _____/s_____
                                         SAILAJA M. PAIDIPATY
                                         Assistant United States Attorney